JOSEPH A. CATLIN *vs.* ROBERT J. CATLIN.

*Construction of Article 47 of the Code in respect to the Right of Election.*

Under proceedings in equity, a commission was issued in accordance with Article 47 of the Code to five persons to value and divide the land of an intestate. The report of the commissioners, which was confirmed, showed that the estate consisted of two farms and a house and lot, and would not admit of any other division than the actual parcels in which the property was found. The oldest son of the intestate, who was entitled to elect, by written election duly filed, elected to take *all the estate* at the valuation of the commissioners. On the appeal of the next oldest son, from an order overruling his exceptions to said election, and declaring the election rightful, it was HELD:

That the Court below committed no error in deciding that the right of election extended to the whole estate, notwithstanding its division into parcels less than the number of heirs.

The right of election is in no event confined to the right of choice between parcels, but is a right to take the whole estate, if indivisible among the heirs; and to take all or any parcel or parcels, if divided into parcels less than the number of heirs.

APPEAL from the Circuit Court for Queen Anne's County, in Equity.

The case is stated in the opinion of the Court.

The cause was argued for the appellant, before BARTOL, C. J., YELLOTT, MILLER, ALVEY, and IRVING, J., and submitted on brief for the appellee.

*James A. Pearce,* and *Henry W. Archer,* for the appellant.

*Richard Hynson, J. B. Brown,* and *E. H. Brown,* for the appellee.

IRVING, J., delivered the opinion of the Court.

Proceedings were taken in equity, in the Circuit Court for Queen Anne's County, for the division of the real estate of Joseph Catlin who had died intestate, leaving three adult sons, and some grandchildren who were minors, and the children of a deceased son. A commission was issued, in accordance with Article 47 of the Code, to five persons to value and divide the land. The commissioners reported the estate as existing in three parcels, viz., two farms and a house and lot. They laid off the widow's dower, and valued the several parcels separately, and in the aggregate, subject to certain incumbrances resting upon them respectively, and then reported that the property was indivisible between the parties entitled, without loss or injury to them, and would not admit of any other division than the actual parcels in which the property was found and was accordingly valued. The report of the commissioners having been confirmed by the Court, Robert J. Catlin, oldest son of the deceased, and entitled to elect, by written election duly filed, elected to take *all the estate* at the valuation of the commissioners. To this election the appellant, the next oldest son, filed exceptions, alleging as ground of objection that Robert J. Catlin's right of election was confined to one of the parcels and that he could not take by election the whole estate. This caveat the Circuit Court overruled, and passed an order declaring the election rightful, and directing the execution of a bond with security in sufficient penalty conditioned for the payment to the several heirs of their proportions of the valuation in money. From this order the appeal was taken. The sole question for consideration and determination may be thus stated : is the right of election, of the person entitled to it, restricted to one of the several parts into

which an estate is divided by the commissioners, or is found by them to exist and is so certified, when the estate is not susceptible of equal division among the parties entitled thereto ?  After the most careful examination of all the Acts of Assembly which have ever been passed, in the State, on the subject, we are constrained to think the Circuit Court committed no error in deciding, that the right of election, in such case, extended to the whole estate, notwithstanding the division into parcels less than the number of heirs.  Prior to the Act of 1786, chapter 45, the right of primogeniture existed in the State, as at common law ; and the oldest son by inheritance took the whole of the real estate to the exclusion of all the other heirs.  The preamble of this Act of 1786 is as follows:  "Whereas, the law of descents which originated with the feudal system and military tenures, is contrary to justice, and ought to be abolished."  Then follows a section declaring that "estates in lands, tenements and hereditaments," in this State, "shall descend to the kindred, male and female, in the following order, to wit: first to the child or children and their descendants, if any, equally," &c.  This section, which proceeds to provide for the descent in all cases, is followed by sundry sections not specially bearing upon the question before us, until the eighth section is reached. This eighth section authorizes the County Court, on the application of any person interested in the estate, to issue a commission to five discreet sensible men to value and divide the estate among the parties entitled to it, if the same be susceptible of division, and if it should prove indivisible among them without loss or injury, "then the eldest son, child, or person entitled, if of age, shall have election to take the whole estate, and pay to the others their just proportions of the value in money ;" and if the eldest refused, then the next eldest succeeded to the right of election until all the adults had enjoyed the opportunity of election.  If all refused, then the property was to

be sold and the proceeds divided. In case all the heirs were minors, this section expressly provided that the land should not be sold until the eldest should come of age. The ninth section puts a restriction upon the commissioners in respect to dividing the land, if they should not find the same worth more than fifteen pounds per acre. In such case, the land was forbidden to be divided into shares less than fifty acres each; and if it was not worth more than fifteen pounds per acre it was to be divided into as many shares as the quantity divided by fifty will give. Then, if there were not enough shares to distribute to each heir a share, "the land so divided shall be offered, and if accepted, belong to the eldest male persons entitled by the course of descent as by this Act is settled, if the number of males entitled be sufficient to take the whole, and if not, to the eldest females to make the number sufficient to take the whole, and if there be no males, then to the eldest females; and if any person refuses to accept the land as aforesaid, then the same shall be offered to the persons entitled next in seniority, pursuing the rule between males and females as above directed." Under this section the persons left without any share were to have the value of their proportionate share in money, to come from the personal estate if sufficient, and if not, the balance to be a lien equally on the land of those getting land. In this Act, and especially in this ninth section, and the title, the appellant thinks the key to the interpretation of the law as it now stands in the Code, is to be found; and counsel have argued with very great ability in support of this theory. But conceding their construction of this Act, for the purposes of this decision, to be right; still it has been amended and re-amended, until many, if not most, of its provisions have entirely disappeared; and by the Act of 1820, chapter 191, all these Acts were repealed and an entirely new one was passed, under the title of "An Act to amend and reduce into one system the laws to direct

descents." The phraseology of the several Acts which have amended and finally repealed the Act of 1786, is in some particulars so changed as to make it, at least, doubtful whether subsequent Legislatures had the same understanding of the Act of 1786 and the meaning of its makers, which is taken and contended for, by the appellants. There can be no doubt that all the Acts, beginning with 1786, designed the inheritance, if capable of division, to be equally divided. The intent was to render the estate, held in parcenary or " in common, one in severalty ; either by a division, when it is susceptible of it, or by an election, or by a sale of the whole." *Stevens vs. Richardson*, 6 *H. & J.*, 158. It was to be equally divided in kind, if possible, within the restrictions of the ninth section of the Act of 1786, which forbade equal division of the land, under certain circumstances already mentioned. But it is equally clear, that equality in money value was the prime object to be secured among the heirs. It was intended all should share alike in the division of the estate so far as the money value of the estate was concerned. The first Act and all subsequent ones retained, to a certain extent, the common law idea of the superiority in right of the eldest male heir. Hence, to him was accorded, as of right, the privilege of taking the whole estate if indivisible, and paying the others an equivalent in money according to the valuation of the commissioners. It was not only a sentimental privilege of retaining the patrimonial estate, but it was a valuable right, intrinsically so, and capable of alienation so that the purchaser succeeded, (though an entire stranger to the family and its sentiments,) to the right of election. If the eldest male heir of age refused to take, the eldest female enjoyed the right, and if she was married, the husband took the right of election in her right, even to her exclusion of any right in the land as such—his election giving him an absolute title. *Stevens vs. Richardson*, 6 *H. & J.*, 156. Absolute equality there-

Catlin *vs.* Catlin.

fore, in *all* respects was not contemplated. By section 5. of chapter 160 of the Acts of 1809, if the land was not. equally divisible among the parties, the commissioners. were authorized to divide it into as many parts as it could advantageously be divided into, irrespective of the respective value or quantity of the parts; each of which was to be separately valued. It provided also that the right of election to take *the several parts* "shall be according to the rules of the Act of Assembly entitled an Act to regulate descents and the several supplements thereto." The several supplements referred to are the Act of 1802, ch. 94, and the Act of 1799, chapter 49. The ninth section of 1786, as before stated, restricted the commissioners when dividing into less parcels than the number of heirs, to dividing into parcels of equal quantity and value. Enforcement of the provisions of that section therefore would seem to be made impracticable, not to say impossible, by this fifth section of the Act of 1809. In support of the theory of appellant, his counsel have contended that the election provided for in this fifth section of the Act of 1809, is that which is prescribed by the ninth section of the Act of 1786, and not that which is prescribed by the eighth section of the Act of 1786. Assuming the appellant is right in his construction of the ninth section referred to, it does not follow that. the provisions of the ninth section are referred to here at all. It may as well be the election provided for in the eighth section, if there be difference in the two. A different condition of things is authorized and provided for in the fifth section of Act of 1809, from that which is provided for in the ninth section of Act of 1786. The construction of the appellant, in support of his case, asks us to construe Acts which have been repealed, as a method of reaching the construction of the existing statute. There is contention about their proper construction and there is no judicial decision on the point involved. If there was no room for doubt as to the meaning; or if there was judicial deter-

Catlin *vs.* Catlin.

mination, either appellate or of a lower Court to guide us; or, if there was evidence of a well established practice, under these ancient statutes, on which we could rest for the accepted meaning of these Acts, we might resort to either of these sources for help, and could take them as some guide to the construction of the existing statute, as far as it is apparent no departure from the ancient law has been contemplated.    But in the absence of all, or any, of those evidences of what was understood to be the law in those early times, we do not feel called upon to construe those statutes.    Looking at the ninth section of the Act of 1786 in connection with the fifth and sixth sections of the Act of 1809, there is such a contrast, and repugnancy between the two, as disables us from determining, readily, that the election referred to in the latter case has any reference to the election or selection contemplated by the ninth section of 1786.    There would be as good reason for holding the ninth section wholly repealed by implication and repugnancy, and that the reference respecting election is to the eighth section which stood unaffected.    But this we are not called on to settle, for it is not absolutely clear what was meant, but we think the subsequent legislation, which it is our province to construe, in this case, in the light of all its concurrent provisions, and its more general interpretation in practice, frees us from difficulty in deciding this case.

The whole subject-matter underwent revision and amendment in 1820, and by chapter 191 of the Acts of that year *all* the *preceding legislation* was *repealed,* and a new Act adopted, which in large degree simplified the matter and made the object of the law more intelligible.    The Code, Article 47, substantially, if not *verbatim,* reproduces this Act of 1820 with such additions as was, thereafter, and before the adoption of the Code, made by the Legislature. The Act of 1820 being literally brought forward in the Code we shall refer to the sections as they are designated therein.

In this Article we find the same provision for the division of the land into equal parts, if practicable, among the heirs, and if not, for its valuation. The right of election, originally given to " the eldest son, child, or person entitled," in regular succession, to take the estate at the valuation, and to pay the others their part of the money valuation, is preserved. Under it the right to alienate the privilege of election is still preserved; so that the purchaser can elect. The right of the husband to take by election, in right of his wife, is retained. Section 38 provides for the valuation of the estate, and its equal division among the parties entitled, if that be possible without loss or injury to them. Section 39 provides for division into such parts as it is capable of, if not capable of equal division, and the valuation of the separate parts in money subject to any incumbrance thereon. Section 40 provides for the survey. Section 41 provides that if the estate is not equally divided, but is divided into as many parts as it is susceptible of, and the commissioners' judgment is approved by the Court, "the right of election to take *the several parts* into which the estate may have been divided, shall be according to the rules herein mentioned." The only rule respecting election is found in the succeeding sections, beginning with 44; in not one of which is there any provision akin to that made in the ninth section of the Act of 1786. So that the contention, that the provisions of that Act (which are repealed,) are by construction to be interjected here cannot be sustained. The 44th section says " the eldest son, child or person entitled, if of age, shall have election to take the *whole estate,* and pay to the others their just proportions of the value in money." Section 45 provides, that "if the eldest child or person entitled, refuses to take the estate, and pay to the others money for their proportions, the next eldest child or person entitled, being of age, shall have the same election, and so on to the youngest child, or person entitled." The 46th sec-

tion provides for the election by the purchaser of any heir's share who was entitled to elect. Publication against a non-resident entitled to election is provided for in the 47th section. The 48th provides for election of next in succession if person first entitled is *non compos.* The 49th provides, that eldest female may take, if eldest male is not of age, and gives husband right to elect in right of his wife. Thus we see no mention is made, in any of these sections, (or elsewhere in the Article) of any *other election* than *election* to take "the whole estate," or "the several parts." The right in the latter case was expressly made, by section 41, to be by the same rule as the former, which is a right to take "the whole estate." This right to take "the several parts," by election, must mean to include the right to take all, if the person electing chooses; for there are no words qualifying or restricting the election, in such case, into a right of selecting one part only. Had such been the object of the law-makers, apt words would have been chosen which would naturally so import. The words "elect" and "election" being always used, they must be supposed to mean the same thing whenever used, with reference to the same subject in the same Act; and not to mean a right to take *all* in one place, and only a right to *select a part* in another place. Division into parcels, when equally indivisible, was probably provided for to promote advantageous sale, if that became necessary. By implication from the other sections a practice has been sanctioned, in some parts of the State, of allowing the election, in such case, to be of the whole or a parcel only, as elector chose; thereby construing the Act of 1820 to enlarge the right given by 1786. Section 50 provides, that "every person entitled" to elect, or refuse the whole "*or any part,*" may elect in writing. Appellant insists, that no implication in favor of appellee's view can be drawn from the language of this section, in construing the Act of 1820; for it comes from the Act of 1827, ch. 208, which

was treating of the subject as a whole. This finds an answer in the 51st section where the same language exactly is used and taken directly from the Act of 1820. That section says, "The person making an election to take the estate, or any part thereof, at the valuation of the commissioners, shall give bond," &c. The same language is used also in section 52, which provides for the sale of what is refused to be taken at the valuation; which section is also taken from the Act of 1820. From this analysis we think it abundantly clear that the right of election is in no event confined to the right of choice between parcels, but is a right to take the whole estate by express provision, if indivisible among the heirs, and to take all, or any parcel or parcels, if divided into parcels less than the number of heirs. This latter right is by implication as has already been stated. It is not contended that any appellate decision exists directly in point, and we have found none. A majority of the Court are aware, however, of an accepted construction and practice accordingly, in conformity with the views herein expressed, in their circuits. It is a practice which has obtained under the administration of some very eminent Judges, which makes the practice of very high authority, as indicating their construction of the statute. It is a construction which the form of refusal in *Evans' Harris*, page 84, seems to sustain; and, in the absence of judicial decision, we can have no better evidence of what the law is held to be than precedents on the subject which are held in as high repute as the volume we cite. We are aware this practice has not obtained everywhere in the State, but learn that in certain portions of the State a different view has prevailed; and we have been cited to *Wilhelm vs. Wilhelm*, 4 *Md. Ch. Dec.*, 333, as indicating that Chancellor JOHNSON construed the law in accordance with appellant's view. It is not pretended it is an authority directly on the question, but only inferentially. The Chancellor's language relied on is, speak-

Catlin *vs.* Catlin.

ing of election, "it is a right which has no existence unless the commissioners determine that the estate cannot be divided without loss or injury." Giving the Chancellor's language its fullest force, we do not see it supports appellant's contention. The case he was considering was one where the estate was actually divided by the commissioners between all the heirs; and the exceptions were to what had been done, and we suppose from the Chancellor's allusion to the subject, that some objection had been made that the right of election was some way interfered with, though it does not appear in the case why he spoke of election at all. But he must have meant only that election did not exist where the estate could be divided *between all.* For he cannot be understood as excluding the right altogether where it is partially divisible without loss or injury. So understanding him, he gives no intimation on the question whether in the latter case the election is restricted to one of the parcels of the partial division. We think a fair construction of the law justifies the practice more largely obtaining, and under which great numbers of titles have been taken, and on which they rest. To deny it will shake the title in many instances, and be productive of great inconvenience. If we had doubt as to the correctness of the construction on which the practice alluded to has grown, we should hesitate to disturb it. In the language of Judge Earle, in *Stevens vs. Richardson,* (6 *H. & J.,* 160,) with respect to the election of the husband in right of his wife, (which originally obtained in practice under the Act of 1786, without direct authority for it,) "considering that it would be of serious moment to the community to cast a shade of doubt on this doctrine, at this late period, this Court must decide" that such an election as that which was permitted by the order appealed from in this case, was admissible.

*Affirmed, and*
*cause remanded.*

(Decided 16th November, 1883.)